**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JAI DAVID ORTIZ,                                                      No. 9:16-CV-0756
                                                                              (GTS/CFH)

                                        Plaintiff,

                 v.

NUNZIO E. DOLDO, et al.,

                                        Defendants.

_____


**APPEARANCES:**                              **OF COUNSEL:**

Jai David Ortiz
160 Bay Ridge Parkway
Ground Floor
Brooklyn, New York 11209
Plaintiff pro se

Attorney General for the                        KEITH J. STARLIN, ESQ.
  State of New York                              Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff pro se Jai David Ortiz ("plaintiff"), a former inmate who was, at all relevant

times, in the custody of the New York Department of Corrections and Community

Supervision ("DOCCS") brings this action pursuant to 42 U.S.C. § 1983, alleging that

_____

        [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to
28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Superintendent ("Supt.") Nunzio E. Doldo, Corrections Sergeant ("Sgt.") Stanley Steveckis,[2] Sgt. Allen, Deputy Superintendent for Security ("DSS") McAuliffe, Corrections Officer ("C.O.") S. Dawley, C.O. Kevin Ryder, and Dr. Ramineni – who, at all relevant times, were employed at Cape Vincent Correctional Facility ("Cape Vincent") and Mohawk Correctional Facility ("Mohawk")[3] – violated his constitutional rights under the First and Eighth Amendments, as well as his right to attorney-client privilege. See Dkt. No. 10 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 59. Plaintiff did not file a response. For the following reasons, it is recommended that defendants' motion be granted.

## I. Failure to Respond

Plaintiff did not oppose defendants' Motion for Summary Judgment and did not ask for an extension of time to respond. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 59-1. Thus, plaintiff was adequately apprised of the pendency of the motion and the consequences of failing to respond. However, "[t]he fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, a defendant is entitled to

---

[2] The undersigned notes that the correct spelling of defendant's name is "Staveckis," and will use that spelling for the purposes of this motion. See Dkt. No. 59-7.

[3] Dr. Ramineni is the only defendant employed at Mohawk. Am. Compl. ¶ 47.

judgment only if the material facts demonstrate his entitlement to judgment as a matter of law.  Id.; FED. R. CIV. P. 56(c).  Additionally, "[a] verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ."  Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted). Consequently, the facts set forth in defendants' Rule 7.1 Statement of Material Facts are accepted as true, but only as to those facts that are not disputed by the facts set forth in the verified amended complaint. N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

## II. Background

### A. Plaintiff's Recitation of the Facts

#### 1. Claims Occurring at Cape Vincent

The facts are related herein in the light most favorable to plaintiff as the nonmoving party.  See subsection III.A. infra.  Plaintiff alleges that he arrived at Cape Vincent on or about July 18, 2014.  Am. Compl. ¶ 14.  On July 1, 2015, he mailed a "confidential complaint" to Supt. Doldo concerning "a continuing course of criminal misconduct being committed by [C.O.] Dawley."  Id. ¶ 15.  In the July 1, 2015 letter, plaintiff alleged that C.O. Dawley reported to duty "reeking of alcohol, inebriated drunk, and planting drugs and weapons on inmates to set them up."  Id. ¶ 16.  Plaintiff informed Supt. Doldo where C.O. Dawley hid the drugs and weapons, and mentioned "other verifiable instances of [C.O.] Dawley's misconduct."  Id.  Supt. Doldo and DSS McAuliffe failed to investigate C.O.

Dawley's misconduct.  Id. ¶ 17.  On July 9, 2015, plaintiff's cell was randomly searched.  Id. ¶ 17.  Three days later, C.O. Dawley  inquired as to why plaintiff "wrote him up."  Id. ¶ 18.  Plaintiff stated that what C.O. Dawley was doing was "just not right."  Id.  C.O. Dawley became "highly upset," and stated, "I have been setting inmates up for my entire career, 15 years, and nothing ever happens to me."  Id.  C.O. Dawley began to search plaintiff's cell.  Id. ¶ 20.  When plaintiff requested to watch, he ordered him to "go back to the day-room, [or he] would beat the shit out of [him] right now."  Id.  Plaintiff observed C.O. Dawley from the observation window "relentlessly going through [his] privileged legal correspondence."  Id.  C.O. Dawley "read each document, [and] then threw it on the floor."  Id.  Plaintiff's documents were in file folders marked "Confidential Legal."  Id.  C.O. Dawley searched plaintiff's cell for approximately one-hour, before finding the confidential letter that he sent to Supt. Doldo.  Id. ¶ 21.  C.O. Dawley placed the letter in his pocket.  Id.  Plaintiff witnessed C.O. Dawley make a phone call, and read the letter to the person on the phone.  Id.

During evening meal, plaintiff and two other inmates reported C.O. Dawley's actions to the Sergeant's Office.  Am. Compl. ¶ 21.  Sgt. Staveckis and Sgt. Allen interviewed plaintiff regarding his allegations against C.O. Dawley.  Id. ¶ 22.  Plaintiff informed both men that he had previously reported C.O. Dawley for misconduct, his "plea for anonymity had been disregarded, and because [C.O.] Dawley was known for his propensity for retaliation and excessive force," he now feared for his safety.  Id.  Plaintiff alleges that he requested protection because he believed C.O. Dawley's threats to be genuine.  Id.  Sgt. Staveckis and Sgt. Allen ordered plaintiff to return to his cell block.  Id.  On returning to his

cell, plaintiff found his legal papers scattered on the ground and covered with coffee grinds and tobacco. Id. ¶ 23. He also found the laces of his sneakers tied into various knots, and toothpaste squirted into the pockets of his pants. Id. Plaintiff alleges that it took him approximately three hours to rearrange his property as C.O. Dawley "humiliat[ed him] with racial epithets[ ] and disgusting profanities." Id.

On July 13, 2015, C.O. Dawley informed the inmates in plaintiff's cell block that he was a "rat," and that he had legal mail. Am. Compl. ¶ 24. Ten minutes later, while plaintiff waited to receive his mail, an inmate informed plaintiff that C.O. Dawley was searching his cell. Id. C.O. Dawley ordered plaintiff to place his hands against the wall, struck him on the back of the neck, and slammed his face into the concrete wall. Id. C.O. Dawley then choked plaintiff from behind, and questioned whether he had swallowed drugs. Id. C.O. Dawley left the cell block area, and reported his injuries to the infirmary. Id. ¶ 25. Sgt. Staveckis interviewed plaintiff, and informed him that he would be moved to another housing unit. Id. When plaintiff returned to his housing unit to collect his property, he found his legal papers scattered on the floor, and the combination locks on his lockers changed. Id. ¶ 26. Plaintiff contends that he was unable to sleep due to his injuries, which included a "splitting headache," swollen face, swollen right eye, a ping-pong ball sized bump on his forehead, and pain in his neck that radiated down his spine and into the backs of his legs. Id. ¶ 27. Several days later, non-party Senior Investigator Retrosi from the Office of Special Investigation interviewed plaintiff regarding the allegations against C.O. Dawley. Id. ¶ 31. Plaintiff requested that he be transferred to a different facility, but the transfer never occurred. Id.

5

On August 10, 2015, C.O. Dawley grabbed a legal letter plaintiff had received, read it, ripped it up, and flung a file folder of documents into his face. Am. Compl. ¶ 32. The file folder hit plaintiff in the eye and cut his eyelid. Id. C.O. Dawley threatened to "dump [plaintiff] on the floor," and yelled sexual profanities at him. Id. Plaintiff alerted Sgt. Staveckis to C.O. Dawley's alleged misconduct, but his complaint was ignored. Id. Plaintiff then called his appellate attorney, who, in turn, informed Cape Vincent of what had occurred. Id. Sgt. Staveckis returned to the housing unit and escorted C.O. Dawley off of the unit. Id. Sgt. Staveckis began an investigation into the incident. Id.

On September 17, 2015, Cape Vincent staff conducted a security search pursuant to an incident that had occurred the previous night. Am. Compl. ¶ 33. Although C.O. Ryder was not a part of the search team, he participated in the search of plaintiff's cell, and read and tampered with plaintiff's legal materials and property. Id. C.O. Ryder mixed plaintiff's legal papers with another inmate's. Id. ¶ 34. C.O. Ryder told plaintiff, "let's see if your lawyer can have me removed from my post." Id. Plaintiff alleges that from July 12, 2015 through September 25, 2015, he was subjected to constant harassment, retaliation, searches, and abuse. Id. ¶ 39. He contends that he suffered pain, fear, anxiety, insomnia, and panic attacks, and lost thirty-four pounds. Id.

### 2. Claims Occurring at Mohawk

Plaintiff arrived at Mohawk on October 2, 2015. Am. Compl. ¶ 46. On arrival, he informed the non-party unnamed nurse that he was in pain and had limited movement in his neck. Id. He also informed the nurse that an x-ray of his neck had been ordered by

6

his previous medical provider at Cape Vincent.  Id.  The nurse issued plaintiff a medical permit for a bottom bunk until he saw a doctor.  Id.  On October 19, 2015, plaintiff met with Dr. Ramineni.  Id. ¶ 47.  Plaintiff informed Dr. Ramineni that he still felt pain from injuries sustained while at Cape Vincent, and that his previous medical provider had ordered an x-ray of his neck.  Id. ¶ 47.  Plaintiff alleges that, at first, Dr. Ramineni agreed to send him for an x-ray, but, after reading his medical file, "became dismissive" and claimed that an x-ray had not been ordered.  Id.  On March 20, 2016, plaintiff met with Dr. Ramineni.  Id. ¶ 48.  Dr. Ramineni refused to provide plaintiff with a bottom bunk permit or order an x-ray. Id.  On May 23, 2016, plaintiff met with Dr. Ramineni, who continued to refuse to order an x-ray, and refused to issue plaintiff a "no work" restriction.  Id. ¶ 50.

On June 9, 2016, plaintiff met with Dr. Ramineni.  Am. Compl. ¶ 51.  Dr. Ramineni told plaintiff that he was "pretending to be in pain," and sent him for an x-ray of his right hand.  Id.  On plaintiff's return to the facility, Dr. Ramineni issued plaintiff a "no use right hand bottom bunk permit" for three months.  Id.  Plaintiff was seen by an outside provider at Upstate Orthopedics, who informed him that he needed surgery on his right hand.  Id. On August 22, 2016, Dr. Ramineni sent plaintiff a "diagnostic testing notification," which stated that the August 12, 2016 x-ray "require[d] no action at this time," and that he would not be receiving a spinal x-ray, surgery, or any other treatment.  Id. ¶ 53.

### B. Defendants' Recitation of the Facts

On July 1, 2015, plaintiff sent a letter to Supt. Doldo alleging that C.O. Dawley had engaged in misconduct.  Dkt. No. 59-2 ¶ 3.  In the letter, plaintiff contended that he was

"living under the threat of being assaulted by [C.O.] Dawley," and that C.O. Dawley had been intoxicated while on duty, smuggled drugs and weapons into the facility, disregarded facility rules, mishandled inmate mail, and attempted to deny inmate's certain privileges. Id. ¶ 4. At the time plaintiff wrote the letter, he had never had a problem with C.O. Dawley, and he was not attempting to advise Supt. Doldo of anything C.O. Dawley had done to him. Id. ¶ 6. Supt. Doldo referred plaintiff's letter to DSS McAuliffe, who, in turn, referred the letter to DOCCS' Office of Special Investigations ("OSI"). Id. ¶ 10. DSS McAuliffe left Cape Vincent and became the Superintendent of Riverview Correctional Facility on July 15, 2015, while the OSI investigation was pending. Id. ¶ 12. Neither Supt. Doldo nor DSS McAuliffe informed C.O. Dawley about the July 1, 2015 letter. Id. ¶ 13.

Plaintiff contends that on July 12, 2015, C.O. Dawley searched his cell, read his privileged legal correspondence, ripped up his legal papers, confiscated a confidential letter, and destroyed his property. Dkt. No. 59-2 ¶ 14. Following this incident, plaintiff claims that he spoke with Sgt. Staveckis and Sgt. Allen, and asked for protection "because he feared for his safety due to [C.O.] Dawley's 'propensity for retaliation and excessive force.'" Id. ¶¶ 15, 16 (citation omitted). Plaintiff's speculation regarding C.O. Dawley was not based on plaintiff's personal interactions with him, or anything that C.O. Dawley had done to plaintiff; instead, plaintiff's speculation was based on a prior lawsuit against C.O. Dawley by an inmate at Fishkill Correctional Facility. Id. ¶ 17. Sgt. Staveckis recalls meeting with plaintiff at the infirmary on July 12, 2015. Id. ¶ 18. Sgt. Staveckis prepared a memorandum, dated July 12, 2015, detailing that conversation. Id. ¶ 19. The memorandum indicates that plaintiff was afraid because C.O. Dawley "threatened to plant

weapons or drugs on anyone who doesn't follow his orders." Id. ¶ 20 (internal quotation marks and citation omitted). Plaintiff did not mention that he feared assault, nor did he ask for protection. Id. ¶¶ 20, 21. If plaintiff had asked for protection, Sgt. Staveckis would have documented that request in the memorandum, as well as any action he may have taken in response to the request. Id. ¶ 22. Sgt. Allen was only in the room for a brief period while plaintiff spoke with Sgt. Staveckis on July 12, 2015. Id. ¶ 23. Sgt. Allen does not recall a conversation with plaintiff wherein plaintiff requested protection from C.O. Dawley. Id. ¶ 24. If plaintiff had requested protection from Sgt. Allen, he would have prepared a memorandum documenting that request; no record exists of such a memorandum. Id. ¶¶ 25, 26.

Plaintiff contends that C.O. Dawley assaulted him on July 13, 2015 and August 10, 2015. Dkt. No. 59-2 ¶ 28. C.O. Dawley denies assaulting plaintiff. Id. ¶ 29. Plaintiff claims that during the alleged assaults, C.O. Dawley destroyed legal papers affecting his criminal appeal. Id. ¶ 30. Plaintiff ultimately completed this appeal, and the state court reversed his criminal conviction in October 2017. Id. ¶ 31. That same month, plaintiff transferred to Rikers Island to await his retrial. Id. ¶ 32. Plaintiff ultimately pleaded guilty. Id. ¶ 33.

On September 17, 2015, C.O. Ryder conducted a random search of plaintiff's cell. Dkt. No. 59-2 ¶ 34. C.O. Ryder did not destroy or improperly touch plaintiff's property, nor did he read plaintiff's legal papers or make inappropriate comments to plaintiff. Id. ¶ 35. Moreover, C.O. Ryder was not aware of plaintiff's July 1, 2015 complaint concerning C.O. Dawley. Id. ¶ 36. During the search, C.O. Ryder did not mention C.O. Dawley. Id. ¶ 38.

Plaintiff transferred to Mohawk in October 2015.  Dkt. No. 59-2 ¶ 39.  Plaintiff contends that Dr. Ramineni deprived him of a spinal x-ray, treatment to his injured hand, and treatment of other pain because plaintiff had been assaulted by a Cape Vincent staff member.  Id. ¶ 40.  Plaintiff claims that Dr. Ramineni read about the "staff assault" in his medical file.  Id. ¶¶ 40, 41.  However, the only reference to a staff assault in plaintiff's medical file is in an entry written by Dr. Ramineni listing plaintiff's complaints.  Id. ¶ 43.  At their first meeting on October 19, 2015, Dr. Ramineni prescribed plaintiff Ibuprofen.  Id. ¶ 44.  A nurse provided plaintiff with a temporary bottom bunk permit on April 28, 2016, at plaintiff's request, and the nurse scheduled an appointment with Dr. Ramineni for May 20, 2016.  Id. ¶ 45.  On May 20, 2016, plaintiff complained of cervical and right hand pain.  Id. ¶ 46.  He also requested a bottom bunk permit.  Id.  Dr. Ramineni noted that plaintiff had good movements and no change from his October 19, 2015 examination.  Id. ¶ 47.  Dr. Ramineni reviewed a June 6, 2014 orthopedic report, which stated that plaintiff's metacarpal fractures had completely healed.  Id. ¶ 48.  Based on the June 2014 report, Dr. Ramineni denied plaintiff's request for a bottom bunk permit.  Id. ¶ 49.

On May 23, 2016, plaintiff refused to let Dr. Ramineni examine his hand.  Dkt. No. 59-2 ¶ 50.  Despite plaintiff's refusal, Dr. Ramineni ordered an x-ray of plaintiff's hand.  Id. ¶ 51.  After reviewing the x-ray results, Dr. Ramineni referred plaintiff to an orthopedist.  Id.  Plaintiff saw the orthopedist in June 2016, and underwent a CT scan of his hand in August 2016.  Id. ¶ 53.  On January 20, 2017, plaintiff underwent hand surgery.  Id. ¶ 54.  Dr. Ramineni examined plaintiff again on February 9, 2017.  Id.  In response to plaintiff's complaints of pain, Dr. Ramineni prescribed plaintiff Mobic to treat his pain and

inflammation. Id. ¶ 55. On March 20, 2017, plaintiff signed a form entitled "Refusal of Medical Examination and/or Treatment." Id. ¶ 56. Nine days later, plaintiff met with Dr. Ramineni and continued to complain of pain. Id. ¶ 57. Dr. Ramineni's examination did not show signs of swelling or deformity, and plaintiff's movements were normal. Id. ¶ 59. Nevertheless, Dr. Ramineni ordered a cervical x-ray, which occurred later that day. Id. The x-ray demonstrated "minimal hypertrophic changes and the vertebrae were all well preserved." Id. ¶ 60. On April 24, 2017, medical staff provided plaintiff with Ibuprofen after he complained of hand and back pain. Id. ¶ 61. On May 19, 2017, plaintiff advised Dr. Ramineni that he was terminating their doctor-patient relationship, and that he would see a private provider after his release. Id. ¶ 62.

### III. Discussion[4]

### A. Legal Standards

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by

---

[4] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that

> pro se status "does not exempt a party from compliance with
> relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d

185, 191-92 (2d Cir. 2008).


### B. Exhaustion

As a threshold matter, defendants argue that plaintiff has failed to exhaust his

administrative remedies as to "a number of the remaining claims." Dkt. No. 59-23 ("Def.

Mem. of Law") at 10. Defendants contend that plaintiff failed to exhaust his administrative

remedies as to his (1) Eighth Amendment failure to protect claims against Supt. Doldo,

DSS McAuliffe, Sgt. Stavecki, and Sgt. Allen arising from the alleged July 2015 incidents;

(2) Eighth Amendment excessive force claim against C.O. Dawley arising from the alleged

August 10, 2015 incident; (3) First Amendment retaliation claim against C.O. Ryder arising

from the alleged September 17, 2015 incident; and (4) Eighth Amendment medical

indifference claims against Dr. Ramineni arising from "anything other than the denial of a

bottom bunk permit and the initial denial of a spinal x-ray." Id. In his amended complaint,

plaintiff claims that he exhausted all of his administrative remedies. Am. Compl. ¶ 55.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any

administrative remedies available to him or her before bringing an action for claims arising

out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also

Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all

inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  Id. at 524.  To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated.  See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).  The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement."  Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016).  Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA.  Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[5]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion."  Ross, 136 S. Ct. at 1858.  Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may

---

[5] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception.  See Williams, 829 F.3d at 123.  The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."  Id. (citing Ross, 136 S. Ct. at 1858-59).

promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[6]

In support of their argument, defendants have proffered copies of plaintiff's three grievances relevant to this action.[7]

On July 15, 2015, plaintiff filed grievance CV-10235-15, alleging that on July 12, 2015, C.O. Dawley improperly searched his cell, read his legal papers, and threatened to "beat the shit out of him."  Dkt. No. 59-20 at 5.  Plaintiff further alleged that on July 13, 2015, C.O. Dawley searched his cell again, destroyed his property, changed the locks on

---

[6] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. § 701.5(b)(1).  If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  Id. §§ 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination.  Id. §§ 701.5(d)(i)-(ii).  CORC must review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received."  Id. § 701.5(d)(3)(ii).  Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

[7] Plaintiff filed a fourth grievance while at Mohawk entitled "Wants Medical Permit for Open Dorm," but it is not relevant to his claims in the underlying action.  Dkt. No. 59-2 ¶ 72.

his lockers, choked him, and slammed his face into a concrete wall.  Id.  On August 10, 2015, the Superintendent denied plaintiff's grievance, and concluded that there was "insufficient information to substantiate the allegations of misconduct."  Id. at 6.  Plaintiff appealed the Superintendent's decision, and in his appeal statement, plaintiff noted that he "was again assaulted on August 10, 2015, inside of [his housing unit] by C.O. S. Dawley, in retaliation for [ ] reporting C.O. S. Dawley's misconduct to the Office of the Inspector General."  Id. at 7.  Plaintiff further noted that C.O. Dawley "read and ripped up [his] confidential legal mail then threw a file folder full of documents into grievant's face." Id.  CORC upheld the determination of the Superintendent.  Id. at 2.  CORC noted that "[i]n regard to the grievant's appeal, CORC asserts that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level."  Id.  CORC further stated that they had "not been presented with sufficient evidence of malfeasance by staff[.]"  Id.

On August 11, 2015, plaintiff filed grievance CV-10261-15, alleging that C.O. Dawley threatened to assault him, read his confidential legal mail, and ripped up said mail. Dkt. No. 59-21 at 10.  Plaintiff further claimed that C.O. Dawley threw a file folder of legal documents in his face, and yelled sexual profanities at him.  Id.  Plaintiff alleged that this was done in retaliation for reporting C.O. Dawley to the Office of the Inspector General. Id.  On August 24, 2015, the Superintendent denied plaintiff's grievance, and concluded that there was "insufficient information to substantiate the allegations."  Id.  Plaintiff appealed the Superintendent's determination, and, in his appeal statement, alleged that he had been "again assaulted by C.O. Dawley in retaliation for [ ] reporting his misconduct.

Specifically, he ripped up my privileged legal correspondence, threatened to, and then assaulted me[.]" Id. at 5.  CORC upheld the determination of the Superintendent.  Id. at 2.  In response to plaintiff's appeal statement, CORC again noted that "all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level."  Id.

On September 17, 2015, plaintiff attempted to amend the abovementioned grievances (CV-10235-15 and CV-10261-15) by writing a letter to non-party Captain Hanson, which described an improper search by C.O. Ryder on September 17, 2015 in retaliation for reporting C.O. Dawley's misconduct.  Dkt. No. 59-17 ("Seguin Decl.") ¶ 24; Dkt. No. 59-22 at 2.

On May 22, 2016, plaintiff filed grievance MHK-13059-16, alleging that Dr. Ramineni was deliberately indifferent to his safety and medial needs by failing to order a spinal x-ray and refusing to provide him a bottom bunk permit.  Dkt. No. 59-23 at 5, 13.  The Mohawk IGRC denied plaintiff's grievance, and plaintiff appealed that denial to the Superintendent.  Id. at 4.  On July 13, 2016, the Superintendent denied plaintiff's grievance, and concluded that, pursuant to plaintiff's medical file, the spinal x-ray and the bottom bunk permit were not "medically necessary."  Id. at 7.  Plaintiff appealed the Superintendent's decision.  Id. at 7-8.  CORC upheld the determination of the Superintendent.  Id. at 2.  CORC further noted that plaintiff's "allegations of assault were addressed in CV-10235-15."  Id.

The undersigned concludes that the record is clear that plaintiff failed to exhaust his administrative remedies as to his Eighth Amendment failure to protect claims against Supt. Doldo, McAuliffe, Sgt. Staveckis, and Sgt. Allen; First Amendment retaliation claim against

C.O. Ryder; and Eighth Amendment deliberate medical indifference claims against Dr. Ramineni arising from anything other than the denial of a bottom bunk permit and the denial of the spinal x-ray in October 2015. See Dkt. Nos. 20, 21, 23. Both grievances CV-10235-15 and CV-10261-15 reference only C.O. Dawley's conduct during the alleged July 12, 2015; July 13, 2015; and August 11, 2015 incidents, and grievance MHK-13059-16 solely concerns Dr. Ramineni's alleged deliberate indifference pertaining to a spinal x-ray and bottom bunk permit. See Dkt. Nos. 59-20 at 5, 59-21 at 10, 59-23 at 5, 13. Although the undersigned acknowledges that, in New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending official, see Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) (concluding that an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies."), the grievance "must place defendants on notice of what, substantively, is claimed in order to permit a proper investigation." Messa v. Woods, No. 9:07-CV-306, 2009 WL 3076120, at *6 (N.D.N.Y. Sept. 23, 2009) (citing Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004)). Here, it is clear that  plaintiff's fully-exhausted grievances do not reference Supt. Doldo, DSS McAuliffe, Sgt. Staveckis, or Sgt. Allen and their alleged failure to protect plaintiff; C.O. Ryder and his alleged retaliatory acts; or any other claims concerning Dr. Ramineni's alleged deliberate indifference.

Insofar as plaintiff attempted to amend grievances CV-10235-15 and CV-10261-15 to include a First Amendment retaliation claim against C.O. Ryder, the undersigned finds that plaintiff's September 17, 2015 letter does not constitute exhaustion. DOCCS Assistant Director of the Inmate Grievance Program ("IGP") Rachael Seguin declared that "[i]t is not

18

DOCCS policy to amend a grievance that has already been investigated and responded to by the Superintendent." Seguin Decl. ¶ 25. Plaintiff sent his September 17, 2015 after the Superintendent had investigated both grievances. See Dkt. No. 59-21 at 7, 10. Moreover, it is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007); Day v. Chaplin, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (noting that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures."). Thus, plaintiff's September 17, 2015 letter to non-party Captain Hanson does not constitute an attempt at exhausting his claims against C.O. Ryder.

As such, the undersigned concludes that plaintiff has failed to exhaust his administrative remedies as to his Eighth Amendment failure to protect claims against Supt. Doldo, McAuliffe, Sgt. Staveckis, and Sgt. Allen; First Amendment retaliation claim against C.O. Ryder; and Eighth Amendment deliberate medical indifference claims against Dr. Ramineni arising from anything other than the denial of a bottom bunk permit and the denial of the spinal x-ray in October 2015.

However, whether plaintiff exhausted his Eighth Amendment excessive force claim against C.O. Dawley arising from the alleged August 10, 2015 incident is a closer question. An inmate's grievance need not "'explicitly discuss the misconduct . . . alleged in the complaint,' so long as the claim was specifically addressed in the prison's denial of the grievance." Albritton v. Morris, No. 13-CV-3708, 2018 WL 1609526, at *10-11 (S.D.N.Y. Mar. 29, 2018) (citing Espinal, 558 F.3d at 128). Moreover, "a claim may be exhausted

when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated." Percinthe v. Julien, No. 08-CV-893, 2009 WL 2223070, at *4 (S.D.N.Y. July 24, 2009).   Here, it is clear that grievances CV-10235-15, CV-10261-15, and MHK-13059-16 do not reference C.O. Dawley's alleged conduct on August 10, 2015. See Dkt. Nos. 59-20 at 5, 59-21 at 10, 59-23 at 5, 13.   However, plaintiff described the alleged August 10, 2015 incident in the appeal statements for grievances CV-10235-15 and CV-10261-15. See Dkt. Nos. 59-20 at 7 (noting that he "was again assaulted on August 10, 2015, inside of [his housing unit] by C.O. S. Dawley, in retaliation for [ ] reporting C.O. S. Dawley's misconduct to the Office of the Inspector General."), 59-21 at 5 (noting that plaintiff had been "assaulted by C.O. Dawley in retaliation for [ ] reporting his misconduct.  Specifically, he ripped up my privileged legal correspondence, threatened to, and then assaulted me[.]").   Neither CORC determination specifically addresses the plaintiff's allegations that C.O. Dawley assaulted him on August 10, 2015, but both make note that with "regard to [plaintiff's] appeal, . . . all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level." See Dkt. Nos. 59-20 at 2, 59-21 at 2.  Further, the grievance investigation materials provided to the Court by defendants make no reference to plaintiff's claims of an alleged assault on August 10, 2015, thereby, suggesting that such claim was not investigated. See generally Dkt. Nos. 59-20, 59-21. As stated, a grievance "must place defendants on notice of what, substantively, is claimed in order to permit a proper investigation." Messa, 2009 WL 3076120, at *6 (citation omitted).  Although CORC was

arguably on notice of plaintiff's allegations regarding the alleged August 10, 2015 incident, there is no indication that they considered them in determining either grievance CV-10235-15 and CV-10261-15, or that Cape Vincent staff conducted a proper investigation into these claims. See Hill v. Smith, No. 9:16-CV-1225 (LEK/ATB), 2018 WL 2172701, at *4 n.15 (N.D.N.Y. Apr. 19, 2018) report-recommendation and order adopted by 2018 WL 2170291 (N.D.N.Y., May 10, 2018) (noting that CORC's phrasing that "relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level" implies that "CORC did not consider them properly raised, and thus, regardless of what those facts may have been, they would not support the exhaustion of plaintiff's remedies."). As such, because plaintiff has failed to "fairly present" this claim, the undersigned concludes that plaintiff has failed to exhaust his administrative remedies as to his Eighth Amendment excessive force claim against C.O. Dawley arising from the alleged incident on August 10, 2015. See Beckles v. Bennett, No. 05 Civ. 2000, 2008 WL 821827, at *13 (S.D.N.Y. Mar. 26, 2008) (citing Porter, 534 U.S. at 524-25).

As there is no indication in the record that the grievance process was unavailable, and plaintiff had ample opportunity to exhaust his grievances prior to his release from DOCCS custody — over two years after last alleged incident at Cape Vincent and over one year from the last alleged incident at Mohawk, see Dkt. Nos. 30, 31, the undersigned finds that plaintiff has failed to exhaust the abovementioned claims, and it is recommended that defendants' motion be granted. See Berry v. Kerik, 366 F.3d 85, 86 (2d Cir. 2004) ("Because Berry failed to exhaust his administrative remedies for several months during

which those remedies were available and because such remedies are no longer available, dismissal with prejudice was proper."); Prescott v. Annetts, No. 09 Civ. 4435(CM)(LMS), 2010 WL 3020023, at *4 (S.D.N.Y. July 22, 2010) ("Here, Plaintiff had more than two years in which he could have pursued administrative remedies. Those procedures are no longer available to him because he is no longer incarcerated.").

### C. First Amendment

### 1. Mail Interference

"The First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are reasonably related to legitimate penological interests." Thornburgh v. Abbott, 490 U.S. 401, 409 (1989) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)); see also Johnson v. Goord, 445 F.3d 532, 534 (2d Cir.2006) (holding that prisoners do have a right — albeit a limited one — to send and receive mail) (citation omitted). An inmate's legal mail is generally afforded greater protection from interference than nonlegal mail. See Burroughs v. Petrone,138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015) (citing Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). However, "[a] single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." Burroughs, 138 F. Supp. 3d at 210 (citing Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir. 1975). "Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." Davis, 320 F.3d at 351 (quoting Cancel v. Goord, No. 00-CV-2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001)).

Here, plaintiff claims that on July 12, 2015, C.O. Dawley read all of his "privileged legal correspondence," threw pieces of mail on the floor, and confiscated a confidential letter, and on August 10, 2015, C.O. Dawley confiscated a confidential letter from his attorney and ripped it up.  See Am. Compl. ¶¶ 19, 20, 32; Dkt. No. 59-29 ("Pl. Dep.") at 59. However, the undersigned finds that plaintiff's allegations constitute isolated incidents that fail to demonstrate that C.O. Dawley "regularly and unjustifiably interfered with the incoming legal mail."  See Davis, 320 F.3d at 351 (concluding that the plaintiff's "allegations of two instances of mail interference are insufficient to state a claim for denial of access to the courts because [the plaintiff] has not alleged that the interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions.").  Moreover, plaintiff testified that, despite the alleged destruction of "documents relevant to his criminal appeal," and the letter from his attorney, he was able to complete his direct appeal, and his conviction was ultimately reversed.  Pl. Dep. at 56-57, 62-63.  Thus, plaintiff fails to establish that C.O. Dawley's alleged destruction of his legal mail interfered with his direct appeal, or resulted in any other suffering.  See Davis, 320 F.3d at 351; Burroughs, 138 F. Supp. 3d at 210. Accordingly, as plaintiff has not demonstrated a "pattern or practice of mail interference," it is recommended that defendants' motion on this ground be granted.  See Kalamaras v. Mangano, No. 16-CV-0459(JS)(ARL), 2016 WL 4132254, at *10 (E.D.N.Y. Aug. 2, 2016) (citation omitted).

23

## 2. Retaliation

Plaintiff claims that C.O. Dawley retaliated against him for filing a complaint with Supt. Doldo concerning C.O. Dawley's alleged misconduct.  See Am. Compl. ¶¶ 15, 24, 57.  Defendants do not substantively address plaintiff's retaliation claim against C.O. Dawley.  Although defendants seem to suggest that they are not seeking summary judgment as to all of plaintiff's claims, it is unclear whether they move for summary judgment in its entirety as they do not affirmatively state that the pending motion is a motion for partial summary judgment.  See Def. Mem. of Law at 3 ("For the reasons set forth herein and in the accompanying submissions, Defendants are entitled to summary judgment on a number of the remaining claims.").[8]  Out of an abundance of caution, the undersigned will address why it is recommended that defendants are not entitled to summary judgment as to plaintiff's retaliation claim against C.O. Dawley.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d at 352 (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that

_____

[8] The undersigned further notes that defendants' memorandum of law is entitled "Defendants' Memorandum of Law in Support of their Motion for Summary Judgment Pursuant to Rule 56."  See Def. Mem. of Law.

the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. See Graham v. Henderson, 89 F.3d 75, 81 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. It is well-settled that an inmate's written complaints to prison officials constitute protected activity. See Waters v. Prack, No. 9:13–CV–1437 (LEK/DEP), 2015 WL 1506126, at *9 (N.D.N.Y. Mar. 31, 2015) (acknowledging that the plaintiff's written complaints concerning prison conditions and staff conduct constitute protected activity); Williams v. Ingraham, No. 04CV257, 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue — complaints to judicial officials, filing a lawsuit, and grievances — are clearly constitutionally protected rights") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). As such, plaintiff's allegations that he was subjected to retaliatory conduct for writing a complaint concerning C.O. Dawley's alleged conduct satisfies the first element of the retaliation claim. See id.

As to the second element, adverse action, in the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Davis, 320 F.3d at 353. "[A]dverse

action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215. Plaintiff's claim regarding retaliatory assault constitutes adverse action that would deter a similarly situated inmate from exercising his constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 731-32 (S.D.N.Y. 2002) (concluding that retaliatory assault constituted adverse action) (citing inter alia Rivera v. Goord, 119 F. Supp. 2d 327, 339-40 (S.D.N.Y.2000) (same)).

As to the third element, causal connection, the plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002). A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]'" Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville, 224 F. Supp. 2d at 732. In assessing temporal proximity,

> [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

26

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Plaintiff alleges that he mailed a "confidential complaint" to Supt. Doldo concerning C.O. Dawley's behavior on July 1, 2015.  Am. Compl. ¶ 15.  Twelve days later, on July 13, 2015, plaintiff claims that C.O. Dawley called him a "rat," struck him on the back of the neck, and slammed his face into a concrete wall.  Id. ¶ 24.  Plaintiff contends that C.O. Dawley then proceeded to choke him, stating, "did you swallow drugs[?] [Do] you see how easy it is for me[?]"  Id.  The twelve-day gap between C.O. Dawley's alleged retaliatory act and plaintiff's protected conduct is sufficient to establish temporal proximity.  See Lashley v. Wakefield, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005) ("Further, there is a close temporal proximity between plaintiff's protected activities and the misbehavior reports, in some instances only a matter of a few days."); Jordan v. Garvin, No. 01CIV4393LTS/GWG, 2004 WL 302361, at *6 (S.D.N.Y. Feb. 17, 2004) ("[T]he existence of a temporal connection as close as the one present here — just two days — is sufficient by itself to establish the requisite inference of a causal connection.").  Further, C.O. Dawley called plaintiff a "rat," and suggested that it was easy for him to accuse plaintiff of having drugs — a reference to the alleged misconduct plaintiff complained about in the July 1, 2015. Am. Compl. ¶¶ 15, 24.  Although C.O. Dawley denies that this interaction occurred, see Dkt. No. 59-11 ("Dawley Decl.") ¶¶ 5, 6, 9, C.O. Dawley's statements, if true, strongly suggest that he was motivated by a retaliatory intent.   These circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, which precludes the entry of summary judgment in connection with the retaliation claim.  See

27

Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack).

Accordingly, if defendants seek summary judgment in its entirety, it is recommended that the motion on this ground be denied.


### D. Attorney-Client Privilege

Plaintiff contends that C.O. Dawley and C.O. Ryder violated attorney-client privilege by reading and destroying his legal documents. See Am. Compl. ¶ 61. Defendants argue that the attorney-client privilege is a creation of common law, not the Constitution, and, therefore, an alleged violation of the privilege cannot be the basis of recovery in a § 1983 action. See Def. Mem. of Law at 21-22.

> Attorney-client communications have a special status in our legal system; their confidential nature is protected by the attorney-client privilege. The oldest privilege for confidential communications recognized by law, the attorney-client privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observations of law and the administration of justice.

Lonegan v. Hasty, 436 F. Supp. 2d 419, 434 (E.D.N.Y. 2006). The Tenth Circuit has held that, "standing alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." Howell v. Trammell, 728 F.3d 1202, 1222 (10th Cir. 2013) (citations omitted). As defendants note, "the attorney-client privilege constitutes an

evidentiary privilege that is secured by state law, and not by the Constitution or laws of the United States.  As a creature of state law, the attorney-client privilege cannot be asserted as a basis for recovery under § 1983."  Bradt v. Smith, 634 F.2d 796, 800 (5th Cir. 1981).  However, case law suggests that a right to attorney-client privilege arises when the Fifth and Sixth Amendments are considered together.  See Toles v. Oklahoma Dep't of Corr., No. CIV-17-150-D, 2017 WL 1957286, at *4 (W.D. Okla Mar. 28, 2017) (quoting Howell, 728 F.3d at 1222).

Here, even construing plaintiff's claims liberally, plaintiff does not allege a violation of the Sixth Amendment, nor does he allege that C.O. Dawley violated his rights under the Fifth Amendment.  See Viteritti v. Inc. Vill. of Bayville, 831 F. Supp. 2d 583, 592 (E.D.N.Y. 2011) ("The Fifth Amendment governs the conduct of the federal government and federal employees, and does not regulate the activities of state officials or state actors.") (internal quotation marks and citation omitted).  Defendants cite to Madden v. Creative Servs., Inc. as instructive to New York state law.  See Def. Mem. of Law at 22.  In Madden, the Second Circuit affirmed the District Court's dismissal of plaintiff's "claim for breach of the attorney-client privilege, in light of the authoritative ruling of the New York Court of Appeals," Madden v. Creative Servs., Inc., 51 F.3d 11, 11 (2d Cir. 1995), which held that New York state law does not recognize a cause of action for "third-party intrusions on attorney-client confidences[.]" Madden v. Creative Servs., Inc., 84 N.Y.2d 738, 746 (N.Y. 1995).  As such, the undersigned agrees with defendants that the alleged violation does not entitle plaintiff to recovery under § 1983.  See Def. Mem. of Law at 22.  The undersigned also notes that plaintiff has failed to demonstrate that he suffered harm in his state action due to the

alleged destruction and/or reading of his legal material.  <u>See</u> subsection III.C.1. <u>supra</u>.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### E. Eighth Amendment

### 1. Deliberate Medical Indifference

Plaintiff contends that Dr. Ramineni failed to provide him adequate treatment for his serious medical needs in violation of the Eighth Amendment.  <u>See</u> Am. Compl. ¶ 63. Defendants contend that plaintiff fails to demonstrate that Dr. Ramineni was deliberately indifferent to his serious medical needs.  Def. Mem. of Law at 22-26.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain."  U.S. CONST. amend. VIII; <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994) (citing <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976)).  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).  The deliberate indifference standard consists of both an objective and subjective component.  <u>See Hathaway</u>, 37 F.3d at 66.  The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious."  <u>Id.</u> (citation omitted). The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind."  <u>Id.</u> (citation omitted).

As a threshold matter, in order for a prisoner to state a cognizable claim of

deliberate indifference, he must make a showing of serious illness or injury.  See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (citation omitted).  A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain."  Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990).  As there is no bright-line rule to determine whether a condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'"  Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Chance, 143 F.3d at 702 (internal citation omitted)).

Defendants argue that for the purposes of this motion, there is an issue of fact as to whether plaintiff had a serious medical need.  Def. Mem. of Law at 24.  Thus, the undersigned must assess whether Dr. Ramineni acted with a sufficiently culpable state of mind.  See Hathaway, 37 F.3d at 66.  The undersigned notes that plaintiff's deliberate indifference claim against Dr. Ramineni is limited to the exhausted issues set forth supra, including the initial denial of a spinal x-ray and the denial of the bottom bunk permit.  See subsection III.B.1 supra.

A prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "Deliberate indifference is a mental state equivalent to subjective recklessness"

which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir.2014) (internal quotation marks and citation omitted).  Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013).

As to plaintiff's claim that Dr. Ramineni denied him a spinal x-ray in October 2015, the undersigned finds that plaintiff has failed to demonstrate that Dr. Ramineni knew of and disregarded an excessive risk to plaintiff's health or safety. See Farmer, 511 U.S. at 837. On October 8, 2015, six days after his transfer to Mohawk, the medical staff treated plaintiff at sick call.  Dkt. No. 60 ("Pl. Med. Rec.") at 17-18; Dkt. No. 59-14 ("Ramineni Decl.") ¶ 10. Plaintiff stated that an x-ray of his cervical spine had been ordered at Cape Vincent, but had not been done.  Ramineni Decl. ¶ 11.  Plaintiff's medical records show that on September 8, 2015, Cape Vincent medical staff recommended an x-ray of plaintiff's spine due to his complaints of neck pain.  Pl. Med. Rec. at 19; Ramineni Decl. ¶ 9.  Mohawk medical staff scheduled plaintiff an appointment with Dr. Ramineni on October 19, 2015. Pl. Med. Rec. at 17; Ramineni Decl. ¶ 11.  On October 19, 2015, plaintiff met with Dr. Ramineni for an initial evaluation of his medical conditions.  Ramineni Decl. ¶ 12. Plaintiff's

medical record indicates that he complained of pain in his back and a cracking sensation, and notes that plaintiff was "apparently assaulted in previous facility on 7/13/15." Pl. Med. Rec. at 17. Dr. Ramineni declared that he performed a physical examination on plaintiff, wherein he found "no radiation of pain to his upper extremities and [ ] no cervical spine deformity, pain in C-6-7 on deep pressure and his neck movement was normal in all directions." Ramineni Decl. ¶ 12. Based on this examination, Dr. Ramineni found that plaintiff was experiencing "cervical pain-soft tissue," which is a medical term for neck pain. Id. Dr. Ramineni declared that this type of pain is generally treated with ibuprofen and neck exercises. Id. Dr. Ramineni discussed a treatment plan with plaintiff, and advised him to do neck exercises and take 200mg Ibuprofen three times a day when necessary. Id.; Pl. Med. Rec. at 17. Dr. Ramineni again met with plaintiff on May 20, 2016, and noted that there was no change in his cervical spine from the October 19, 2015 examination. Ramineni Decl. ¶ 14.

The record is clear that, after a physical examination, Dr. Ramineni believed that plaintiff's cervical pain symptoms did not warrant an x-ray, and were better treated with neck exercises and medication. Ramineni Decl. ¶ 12; Pl. Med. Rec. at 17. Inmates do not have the constitutional right to the treatment of their choice. See Wright v. Genovese, 694 F. Supp. 2d 137, 155 (N.D.N.Y. Mar. 9, 2010). That plaintiff may have "preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation." Id. (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)). To the extent that Dr. Ramineni's assessment that plaintiff did not need an x-ray differs from that of his previous medical providers at Cape Vincent, this

allegation does not amount to a constitutional violation.  See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).

Further, even if Dr. Ramineni's decision against ordering an x-ray caused plaintiff unintended harm, negligence is not actionable under § 1983.  See Burroughs, 138 F. Supp. 3d at 211 ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983).  That Dr. Ramineni may have been negligent[9] in "diagnosing or treating" plaintiff's medical condition does not amount to deliberate indifference. Adams v. Rock, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *7 (N.D.N.Y. Mar. 24, 2015) (citing Farmer, 511 U.S. at 835) ("Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.").

As to plaintiff's claim that Dr. Ramineni denied him a bottom bunk permit, the undersigned reaches a similar conclusion.  On April 28, 2016, plaintiff requested a bottom bunk medical permit due to bone spurs and a deformity in his right hand.  Pl. Med. Rec. at 17; Ramineni Decl. ¶ 13.  A nurse provided plaintiff with a temporary bottom bunk permit, and scheduled plaintiff to see Dr. Ramineni on May 20, 2016.  Id.  On May 20,

---

[9] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

2016, Dr. Ramineni performed a physical examination on plaintiff, and noted that he had a history of bone spurs in his right hand, and that he had underwent an x-ray on April 28, 2014. Pl. Med. Rec. at 25; Ramineni Decl. ¶ 14. An orthopedic report dated June 6, 2014 stated that the fractures in plaintiff's hand had completely healed. Id. Based on that report, Dr. Ramineni denied plaintiff's request for a bottom bunk permit, as he found there "was no medical indication for it." Ramineni Decl. ¶ 14.

In Felix-Torres v. Graham, this Court that

> [i]n the context of Eighth Amendment claims concerning assignments to upper rather than lower bunks, courts have consistently found that where the gravamen of the claim is that an inmate was improperly denied an order for a lower bunk assignment, this constitutes at most a disagreement over the appropriate treatment, fails to demonstrate deliberate indifference, and is insufficient to withstand a motion for summary judgment.

Felix-Torres v. Graham, 687 F. Supp. 2d 38, 64 (N.D.N.Y. 2009). Nevertheless, where an inmate is assigned to a lower bunk due to a medical order, that medical order was known to the defendants, "and the inmate was thereafter assigned to an upper bunk resulting in an injury to the inmate, the evidence suffices to raise a question of fact on the second prong of the claim." Id. (citing Perdue v. Dreyer, No. 03-CV-770Sr, 2008 WL 4826260, at *5-6 (W.D.N.Y. Nov. 5, 2008)).

Here, after a physical examination and review of plaintiff's medical records, Dr. Ramineni determined at the May 20, 2016 appointment that a bottom bunk permit was not medically necessary. See Ramineni Decl. ¶ 14; Pl. Med. Rec. at 17. Further, there is no indication that a medical order assigned plaintiff to a bottom bunk, or that Dr. Ramineni knew of and disregarded such an order. See Felix-Torres, 687 F. Supp. 2d at 64 (citation

omitted).  As such, the undersigned concludes that Dr. Ramineni's denial of a bottom bunk permit amounts to a disagreement over appropriate treatment, and, therefore, does not amount to an Eighth Amendment violation.  See id.    At most, Dr. Ramineni's denial amounts to mere negligence, which does not amount to deliberate indifference.  See Adams, 2015 WL 1312738, at *7 (citation omitted).

Accordingly, it is recommended that defendants' motion on this ground be granted.


## 2. Excessive Force

As stated above, out of an abundance of caution as to whether defendants moved for summary judgment in its entirety, the undersigned will address why it is recommended that defendants are not entitled to summary judgment as to plaintiff's excessive force claim against C.O. Dawley.  See subsection III.C.2. supra.  To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of

physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7).  In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] . . . the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to plaintiff, plaintiff testified that on July 13, 2015, C.O. Dawley "put [him against the wall[,] told [him] to put [his] hands against the wall[,] . . . [and] smash[ed] [his] face [ ] into a brick wall," resulting in "permanent scars on [his] face." Pl. Dep. at 27; see Am. Compl. ¶ 24.  Plaintiff also testified that C.O. Dawley choked him long enough that he "started losing consciousness." Pl. Dep. at 29.  Plaintiff claims that, after the alleged assault, C.O. Dawley referenced the subject matter of the

complaint plaintiff had recently filed against him.  Am. Compl. ¶ 24.  It is well-settled that "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation."  Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citation omitted)); Tafari v. McCarthy, 714 F. Supp. 2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.").  The undersigned finds that a reasonable factfinder could find plaintiff's testimony credible and determine that C.O. Dawley's actions were wanton and malicious.  See Bylden, 196 F.3d at 263 ("[T]he malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se.").  As such, a genuine issue of material fact exists as to plaintiff's excessive force claim.

Accordingly, if defendants seek summary judgment in its entirety, it is recommended that the motion on this ground be denied.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, defendants' Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 59) be **GRANTED**; and it is further

**RECOMMENDED**, in the alternative, to the extent that the District Judge considers

defendants' motion (Dkt. No. 59) to seek summary judgment in its entirety, that motion be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Dawley;

(2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment excessive force claim C.O. Dawley arising out of the July 13, 2015 incident,

and all remaining claims be **GRANTED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

 **IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[10]

Dated: October 19, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[10] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).